# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

CARSTEN J. QUINLAN,

        Plaintiff,                           Case No. 24-cv-03990

v.

DANIEL PULS,
CHERYL PULS, and
ALISSA PULS

        Defendants.

# AMENDED COMPLAINT

Plaintiff, Carsten J. Quinlan (hereinafter "Plaintiff" or "Mr. Quinlan"), for his Complaint against Defendants Daniel Puls, Cheryl Puls, and Alissa Puls (hereinafter "Ms. Puls"), alleges as follows:

## INTRODUCTION AND SUMMARY OF THE CASE

1.      This is a civil action arising from a coordinated campaign by the Defendants to deprive Plaintiff, Carsten J. Quinlan, of his constitutional and legal rights and tortious actions that harmed Plaintiff. The causes of action include Section 1983 violations of the Fourteenth Amendment (deprivation of due process regarding parental rights), Second Amendment (right to bear arms), and First Amendment (deprivation of free speech). The causes of action also include conspiracy; defamation; negligence; fraud and misrepresentation; malicious prosecution; abuse of process; negligent infliction of emotional distress; willful and wanton misconduct; harassment; tortious interference; assault and battery; intentional infliction of emotional distress; and breach of contract.

2.      Plaintiff, Mr. Quinlan, and Defendant Ms. Puls were married from March 16, 2016, until their divorce on December 8, 2022. They share three minor children: AGQ, a daughter born in 2016; EDQ, a son born in 2018; and LEQ, a daughter born in 2020.

3.      Defendants Cheryl and Daniel Puls are the parents of Defendant Ms. Puls and were previously the parents-in-law of Mr. Quinlan.

4.      From the outset, the marital relationship between Mr. Quinlan and Ms. Puls was marked by discord and conflict. Over time, Ms. Puls began involving her parents in disputes, escalating tensions and drawing Cheryl and Daniel Puls into what became a concerted effort to remove Mr. Quinlan from the family and deprive him of his parental role.

5.      Over the last six years, beginning in October 2018, Defendants have engaged in a sustained and coordinated campaign of malicious and tortious conduct. This campaign included fabricating allegations of domestic violence and sexual abuse against Mr. Quinlan, with the dual objectives of alienating him from his children and securing sole custody of the minor children for Ms. Puls.

6.      The Defendants' actions were part of a broader conspiracy and pattern of deceit, manipulation, and harassment designed to destroy Mr. Quinlan's relationship with his children and to inflict reputational, financial, and emotional harm upon him.

7.      In January 2023, Ms. Puls made false allegations of sexual child abuse against Mr. Quinlan, initiating a criminal prosecution that resulted in her obtaining full custody of the minor children. This occurred just seven weeks after a mediated divorce settlement had established joint custody.

8.      Defendants Cheryl and Daniel Puls actively participated in this campaign by making false allegations directly to third parties and by manipulating, coaching, and tampering with AGQ to fabricate evidence against Mr. Quinlan.

9.      Defendants' tortious conduct has resulted in significant harm to Mr. Quinlan, including financial losses, severe emotional distress, reputational damage, and the erosion of his parental

relationship with his children. Their actions have also caused substantial harm to the minor children, who have endured medical child abuse and parental alienation.

10.    Plaintiff alleges that Defendants conspired together to commit these tortious acts, demonstrating a clear pattern of extreme malice over several years. Their conduct was not only deliberate but egregious, warranting the imposition of damages and other relief as set forth in this Complaint.

11.    As a result of the Defendants' intentional, reckless, and malicious actions, they must be held jointly and severally liable for the damages caused to Plaintiff and the minor children.

## PARTIES

12.    Plaintiff, Carsten J. Quinlan, is an adult residing in Minnesota.

13.    Defendant, Ms. Puls, is an adult and is believed to reside in Wisconsin.

14.    Defendant, Cheryl Puls, is an adult and is believed to reside in Wisconsin.

15.    Defendant, Daniel Puls, is an adult and is believed to reside in Wisconsin.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, 1332, and 1367.

17.    Venue is proper under 28 U.S.C. § 1391(b) as the events giving rise to the claims asserted herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

### Part 1: Summary of Major Events During the Marriage

18.    Plaintiff Carsten J. Quinlan and Defendant Ms. Puls were married for approximately 7 years and have three children together.

19.    Throughout their marriage, the couple often disagreed about the extent and necessity of medical care for their children, with Ms. Puls persistently pushing for more medical interventions and Plaintiff advocating for caution and limiting unnecessary treatments.

20.    On October 4, 2018, Ms. Puls physically assaulted Plaintiff. The contact did not result in bodily harm but was offensive, unwanted, and made Plaintiff reasonably fear for his safety. Plaintiff called the police for intervention, and consequently discord between Plaintiff and the Defendants greatly increased.

21.    Throughout 2019, Ms. Puls made hundreds of verbal and written threats to Mr. Quinlan that effectively told him that if he did not do exactly as Ms. Puls wanted, then Ms. Puls and her parents would find a mechanism to destroy him. The most frequent threat was to make false allegations of domestic violence against Mr. Quinlan.

22.    In addition to the extreme discord in the marriage, Ms. Puls also pushed Mr. Quinlan for a 3rd child, frequently claiming that a subsequent child would fix the marital strife between them. Ms. Puls became pregnant in 2019, however the pregnancy ended in a miscarriage in November 2019.

23.    While at the Emergency Room in Meriter Hospital on November 11, 2019, Ms. Puls made her first attempt to involve the police by telling the staff at the hospital that she was a victim of domestic violence and that she did not want to go home with Mr. Quinlan. The police were called and we had to stay at the hospital all night long. This was Ms. Puls' first of many attempts at instigating Malicious Prosecution of Mr. Quinlan.

24.    In November 2019, Daniel Puls forcibly pushed Plaintiff aside to gain entry into Plaintiff's home after being explicitly denied entry. This action constituted unwanted physical contact and battery. Defendant Daniel Puls' conduct was aggressive and offensive. Daniel Puls's actions were indicative of the Defendants overall disregard for Mr. Quinlan's parental rights.

25.    In November 2019, Ms. Puls made her second attempt (and first successful) instigation of Malicious Prosecution against Mr. Quinlan through making a CPS report alleging physical child abuse against EDQ. Ms. Puls made false allegations of herself and EDQ being "*whipped*" by a blanket by Mr. Quinlan.

4

26.     On December 19, 2019, Ms. Puls again physically assaulted Plaintiff. As with the previous incident, the contact was unwanted, offensive, and intended to provoke Plaintiff. Plaintiff recorded the whole attack on his phone because it would be unlikely that anyone would believe him otherwise. Plaintiff refrained from any physical response, fearing that such a reaction would be used against him in future false accusations of domestic violence.

27.     In February 2020 Mr. Quinlan and Ms. Puls moved into a new house in Middleton WI. This house was custom built for the couple, however on the day of closing Ms. Puls threatened to pull out of the deal unless Mr. Quinlan promised to get her pregnant again to replace the baby lost in the miscarriage. Ms. Puls eventually agreed to close on the house once Mr. Quinlan agreed to impregnate her again.

28.     As a result of Ms. Puls' insane behavior and demands for a pregnancy in return for closing on the house, Mr. Quinlan filed for divorce in February 2020. Ms. Puls cried and begged Mr. Quinlan not to leave her, and promised to cease her abusive behavior if Mr. Quinlan would give the marriage six more months. Mr. Quinlan reluctantly agreed to try once more to fix the marriage.

29.     Ms. Puls became pregnant again in 2020. However approximately halfway through the pregnancy Ms. Puls again called the police and attempted to get Mr. Quinlan into some sort of trouble with the Police by accusing him of damaging her property.

30.     Although Ms. Puls had promised to cease her abusive behavior to prevent Mr. Quinlan from divorcing her (and to give herself more time to get pregnant), she had failed. However, since Ms. Puls became pregnant, Mr. Quinlan was reluctant to divorce her until after she gave birth.

31.     LEQ was born healthy and without any medical complications in November 2020. However Ms. Puls began medically abusing the child shortly after her birth in order to make her into a "medically complex" child. **Ms. Puls did this to prevent Mr. Quinlan from divorcing her.**

32.     The medical child abuse of LEQ is extremely severe. Ms. Puls instigated brain surgery on LEQ in January 2021 simply because she claimed that her head was too large in circumference. She pushed

5

for surgery without even having an MRI done first to validate the need for the surgery. LEQ suffered a throat injury during the surgery that lead to additional medical complications.

33.    At the time, Mr. Quinlan was deceived by this inhumane manipulation of Ms. Puls. Mr. Quinlan remained in the marriage as a result of the medical complications of LEQ that had been fraudulently manufactured by Ms. Puls.

## Part 2: April and May 2021 – First Criminal Charges and Separation

34.    On April 17, 2021, Defendant Cheryl Puls initiated a confrontation in Plaintiff's residence by questioning Plaintiff's four-year-old daughter, AGQ, with inappropriate and leading questions designed to provoke a reaction. When Plaintiff stood to leave the escalating argument, Cheryl physically blocked the doorway between the kitchen and mudroom. Cheryl refused to move and declared that Plaintiff was "*not leaving,*" repeatedly threatening to call the police. Plaintiff calmly attempted to pass, stepping over Cheryl's left foot and sliding past her left shoulder. In response, Cheryl exaggeratedly gasped and struck herself in the face with her phone, falsely claiming Plaintiff had injured her.



35.

**Figure 1 – Daniel Puls Attacks Mr. Quinlan:** Immediately following Cheryl's exaggerated reaction,

Defendant Daniel Puls attacked Plaintiff from behind, placing him in a chokehold with both arms around his neck. Despite knowing Plaintiff's objective was to leave peacefully, Daniel continued to restrain Plaintiff violently, pushing and shoving him while shouting. Daniel persisted in pushing Plaintiff several times as he attempted to leave. Plaintiff did not retaliate physically and instead focused on attempting to exit the home.

36.    Once Plaintiff reached the front door, Daniel again obstructed Plaintiff's path, pushing him out of the house and shouting, "*Get the hell out! And stay out!*" Daniel's aggressive behavior persisted even as Plaintiff left the property. During this time, Cheryl made a 911 call, falsely alleging that Plaintiff had assaulted her by "*body-slamming*" her and intentionally causing harm. This claim was directly contradicted by audio and video evidence of the incident.

37.    The events of April 17, 2021, marked the beginning of Defendants' most overt and coordinated efforts to manipulate legal processes and subject Plaintiff to malicious prosecution. **At this point the parties became openly hostile toward each other.** On April 27, 2021, Cheryl and Daniel falsely accused Plaintiff of domestic violence, leading to his wrongful arrest under mandatory arrest statutes. Cheryl and Daniel intentionally provided false and misleading statements to the Madison Police Department, the 911 operator, and other authorities, exploiting systems designed to protect victims of domestic violence to harm Plaintiff. These actions caused significant emotional, reputational, and financial damage to Plaintiff, setting the stage for further malicious and tortious conduct by Defendants.

38.    Mr. Quinlan was criminally charged with Disorderly Conduct at that time, but the charges were ultimately dropped when Mr. Quinlan demanded his right to a jury trial and refused to concede to any plea bargain. The case was in Dane County, *State of Wisconsin vs. Carsten Quinlan*, 2021CM000844.

39.    On April 27, 2021, shortly after the events involving Cheryl and Daniel Puls, Defendant Ms. Puls unequivocally rejected her parents' false narrative regarding the incident. In a text message sent to Cheryl and Daniel at 4:26 PM, Ms. Puls stated, "***If the video wasn't enough proof, now I know that you framed Carsten.** There will be no contact with me, Carsten or the kids.*" This message demonstrates

that Alissa recognized her parents' malicious intent and their deliberate attempt to falsely portray Plaintiff as violent. At the time, she disapproved of their actions and actively distanced herself from her parents in response.

40.     However, nearly two years later, in February 2023, Ms. Puls reversed her stance and actively participated in perpetuating the false narrative that she had once rejected. In her application for an Order for Protection against Plaintiff, Ms. Puls explicitly cited the April 2021 incident as evidence of Plaintiff's alleged history of violence. Specifically, she stated, "*Relevant Criminal History ... WI 2021 CM 000 844 file the respondent was charged Disorderly conduct from an incident of domestic assault regarding my mother.*" This statement stands in stark contrast to her earlier rejection of the claim, as it deliberately misrepresents the April 2021 incident as legitimate evidence of domestic violence, despite her prior acknowledgment of its falsity.

41.     On May 18, 2021, Ms. Puls attempted to stage a false accusation of domestic violence against Mr. Quinlan. During an argument, she dramatically claimed that Mr. Quinlan had headbutted her, causing a bloody nose. She pointed to tissues as evidence, claiming they were soaked with blood from the alleged injury. However, subsequent investigation revealed these tissues were completely clean and dry, with no trace of blood.



42.

**Figure 2 – Clean and Dry Tissues from Fake Bloody Nose:** These are the tissues that Ms. Puls used to

cover her nose while claiming to have a "*severe bloody nose.*" **Ms. Puls attempted to dispose of the bloodless evidence by disguising the tissues as a dirty diaper and throwing the tissues away in the diaper bin in the garage.** Mr. Quinlan recovered the tissues and photographed them the next day on May 19, 2021. Mr. Quinlan is still in possession of these tissues and is happy to present them as physical evidence if necessary.

43.    In addition to accusing Mr. Quinlan, Ms. Puls also falsely accused Mr. Quinlan's mother of neglect. She claimed that their youngest daughter, LEQ, had been injured while under her grandmother's care. Specifically, she alleged that LEQ had suffered a large bruise on her forehead. However, medical records and physical observations unequivocally disproved these allegations, showing that LEQ had no injuries. This false accusation against Mr. Quinlan's mother was part of a deliberate effort to escalate tension and further alienate Mr. Quinlan from his family.

44.    On May 26, 2021, Mr. Quinlan confronted Ms. Puls with compelling evidence disproving her earlier allegations. He presented medical records confirming that LEQ had no injuries, exposing her false claim against his mother. He also showed her the tissues she had pointed to as evidence of her bloody nose. These tissues were completely clean and devoid of blood, contradicting her story and proving that her claim of being headbutted by Mr. Quinlan was fabricated.

45.    Ms. Puls has told several contradictory stories in a futile attempt to explain the bloodless tissues. At one point, she claimed she had thrown the bloody tissues away in a different location. Later, she asserted she had kept them but refused to produce them when asked. Again, later she claimed to have flushed the tissues. **Ms. Puls is simply a liar; she never had a bloody nose and she was never headbutted by Mr. Quinlan.**

46.    Instead of addressing the evidence, Ms. Puls escalated the situation further by calling the police. When law enforcement arrived, she repeated her claim that Mr. Quinlan had headbutted her on May 18, 2021, causing a bloody nose. However, she was unable to produce any credible evidence to

support this allegation. Her account of the events was riddled with inconsistencies, and her failure to explain why no physical evidence of the injury demonstrates her lack of any credibility.

47.     The responding officers noted the contradictions in her story and observed no probable cause to arrest Mr. Quinlan. The absence of any visible injury or corroborating evidence led them to question her account further. This attempt to involve law enforcement was a continuation of her malicious strategy to frame Mr. Quinlan as abusive, building on the pattern established earlier that month.

48.     Through her false allegations and manipulation of legal processes, Ms. Puls demonstrated a calculated effort to discredit Mr. Quinlan, disrupt his relationships with his children and family, and gain leverage during their marital disputes. These actions caused Mr. Quinlan significant emotional distress and further damaged his relationship with his children.

49.     These false allegations and escalations to the police in April and May of 2021 were not isolated incidents, but **marked the beginning of an extremely aggressive and destructive pattern** of behavior in which Ms. Puls and her parents fabricated false allegations and legal problems for Mr. Quinlan in an effort to gain full control over the children and exhaust Mr. Quinlan's capacity to fight back.

50.     Mr. Quinlan permanently separated from Ms. Puls on May 26, 2021 due to the obvious hostility and willingness of Ms. Puls and her Parents to fabricate false allegations of physical abuse against Mr. Quinlan with reckless disregard of the truth. Mr. Quinlan filed for divorce against Ms. Puls shortly after in June 2021.

## Part 3: Escalation of Allegations During Divorce Proceedings

51.     During the subsequent divorce proceedings Mr. Quinlan remained committed to being actively involved in the medical care and upbringing of the children.  However, Ms. Puls immediately engaged in Parental Alienation behavior to severely limit Mr. Quinlan's access to his children.

52.     Ms. Puls and her parents sought additional opportunities to make false allegations against Mr. Quinlan by using the children as bait. They refused to allow Mr. Quinlan to be with his own children

unless they were also present. Using this strategy Ms. Puls and her parents sought more opportunities to make false allegations of abuse against Mr. Quinlan to gain leverage during the divorce proceedings.

53.     In October 2021 Ms. Puls and her parents made three reports to CPS against Mr. Quinlan. These reports were on October 5, October 25, and October 26. The reports on October 5 and 26 were made by Cheryl Puls, and the report on October 25 was made by Ms. Puls. The reports made on October 25 and 26 seem to tell the same fabricated story, but with contradictory details showing the cooperation of Ms. Puls with her parents to fabricate allegations of sexual abuse against Mr. Quinlan.

54.     Ms. Puls was required to notify Mr. Quinlan of all medical appointments for the children, ensuring that Mr. Quinlan could participate in their healthcare decisions. However, Ms. Puls continued to engage in deceptive practices, repeatedly attempting to arrange medical appointments for the children without informing Mr. Quinlan.

55.     An alarming example of this was in February 2022, when Ms. Puls sought to have LEQ undergo an adenoidectomy (surgery to remove the adenoids from the sinuses). Ms. Puls attempted to hide this surgery from Mr. Quinlan so that he would not challenge the need for it. Mr. Quinlan discovered that Ms. Puls had exaggerated and lied about LEQ's symptoms to justify the surgery and opposed the surgery. Once Ms. Puls' lies were brought to light by Mr. Quinlan, the adenoidectomy was canceled.

56.     As a result of Mr. Quinlan's opposition to the adenoidectomy, in February 2022 Ms. Puls made a motion to gain full medical custody and submitted an affidavit in which she claimed that Mr. Quinlan was opposing medical care of the children and that Mr. Quinlan was intentionally giving the children food they were allergic to. These perjurious statements in her affidavit were outrageous and false.

57.     Despite Mr. Quinlan's opposition and concerns about Ms. Puls' continued dishonesty regarding LEQ's medical needs, Ms. Puls rescheduled the adenoidectomy for May 5, 2022, deliberately choosing a time when Mr. Quinlan would be out of the country on a business trip to Paris to make it impossible for Mr. Quinlan to be involved. This demonstrates her disregard for Mr. Quinlan's parental

rights and continuing pattern of manipulation and deceit in order to exercise full control over the children's medical care and subject LEQ to severe medical child abuse.

58.    In June 2022, Ms. Puls temporarily gained full medical custody of the children by making false allegations of abuse against Mr. Quinlan during a temporary custody hearing.  During the hearing, Ms. Puls falsely testified that Mr. Quinlan had caused her to suffer multiple broken bones and that she had to go to the emergency room at the hospital.  Ms. Puls also made false allegations of rape against Mr. Quinlan.  As a result of this hearing, Mr. Quinlan's parenting time with the children was severely restricted.

59.    Following Ms. Puls' receipt of full custody, there was an extreme increase in the frequency of medical appointments and interventions for all three children, many of which were unnecessary and harmful.  Ms. Puls' control over the children's medical care enabled her to continue her pattern of deception and manipulation, further isolating Plaintiff from his children.



60.

**Figure 3: Plot of Medical Encounters Per Child, Per Month.** This plot shows the extreme expansion of medical appointments orchestrated by Ms. Puls shortly after the birth of LEQ and immediately after she fraudulently stole full medical control over the children in June 2022 and January 2023.

61.    In October 2022, a 63-page Custody Evaluation Report was released, which refuted many of Ms. Puls' claims, including allegations of sexual abuse of the children by Mr. Quinlan. For example, that report stated "*Alissa reported many concerns about Carsten including sexual abuse, children's safety and Carsten engaging in threatening and unpredictable behaviors. Her concerns were supported by her parents. Carsten stated concerns about Alissa not being truthful and trying to set him up so he would have minimal contact with the children. **Information reviewed suggested Alissa has engaged in reaching behaviors regarding her assertions about Carsten's behaviors and the level of severity. Carsten has provided information indicating some of Alissa's reports are not accurate.**"

62.    The Custody Evaluation Report documented Ms. Puls' history of false allegations of sexual abuse and her attempts to manipulate the children against Mr. Quinlan. The report documents clear evidence of conspiracy. For example, the report stated "**Alissa and her parents raised many concerns about the children's overall safety** *with Carsten including concerns of sexual abuse. This writer did not gather any information from professional sources indicating any sexual abuse has occurred.*"

63.    This pattern of false allegations of sexual abuse started during a period in which they were literally impossible, as all of Mr. Quinlan's time with his children was either supervised or in public. These extreme limitations on Mr. Quinlan's parenting time were also caused by Ms. Puls' false allegations of abuse during the divorce proceedings, nevertheless Ms. Puls escalated to make sexual abuse allegations too.

64.    On December 8, 2022, the divorce was finalized through mediation due to the strong evidence against Ms. Puls in the Custody Evaluation Report. Mr. Quinlan was determined to be an equally fit parent and granted joint custody of the children. The Divorce settlement agreement stated "*Both parties are fit and proper persons to be given the care and legal custody of the minor children. **The best interests of the children are served by awarding joint legal custody to both parties.**"

65.    Mr. Quinlan and Ms. Puls settled their divorce through mediation, reaching an agreement for joint custody of their children and an equal partition of assets. While Mr. Quinlan was prepared to

13

move forward and co-parent amicably, Ms. Puls and her parents were dissatisfied with the outcome and continued their campaign to alienate Mr. Quinlan and steal his children through malicious prosecution.

## Part 4: Malicious Prosecution of Criminal Sexual Contact of a Minor

66.    On January 19, 2023, while in a public library, Defendant Daniel Puls threatened Plaintiff by stating that Plaintiff was "*a problem*" that he would "*get rid of.*" This threat was made after Plaintiff asserted his parental rights concerning time with his daughter, LEQ. Defendant's statement caused Plaintiff to fear for his personal safety, fear that Defendants would make more false allegations, and constituted an act of intimidation.

67.    Ms. Puls' relentless campaign of fabricating baseless allegations of sexual abuse against Mr. Quinlan eventually worked because she started focusing upon manipulating AGQ to make the allegations for her like a puppet.

68.    On January 20, 2023, Ms. Puls manipulated Amanda Mann, a mandated reporter at AGQ's school, into filing a CPS report that alleged Mr. Quinlan had engaged in sexual abuse of AGQ.

69.    On January 23, 2023, Detective Kim Richardson and CPS Investigator Hailey Dornfeld started their investigation of Mr. Quinlan. Their investigation was both negligent and fraudulent, resulting in the wrongful arrest of Mr. Quinlan on January 26, 2023. These investigators, along with the City of Woodbury and Washington County are being sued by Mr. Quinlan for these egregious actions. See *Quinlan v. Washington County et. al.* 24-cv-02782, filed in the 8th District Federal Court, for details.

70.    The time frame during which the alleged abuse was claimed to have occurred, between December 8, 2022 and January 26, 2023, was far too brief to accommodate the accusations against Mr. Quinlan. Over these 49 days, **Mr. Quinlan spent only 28 hours alone with AGQ and EDQ in private.** This timeframe between December 8, 2022 and January 26, 2023 is hereafter referred to as the *critical timeframe*.

71.

| Time Spent with AGQ and EDQ During Critical Timeframe | | | | | | |
| December 2022 | | | | | | | January 2023 | | | | | | |
| Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | | | | 1 | 2 | 3 | 1 | 2 | 3 2.5 0 | 4 | 5 2.5 0 | 6 | 7 |
| 4 | 5 | 6 | 7 | 8 2.5 2 | 9 | 10 | 8 | 9 | 10 2.5 0 | 11 | 12 2.5 2 | 13 | 14 8.5 4 |
| 11 | 12 | 13 2.5 1 | 14 | 15 2.5 2 | 16 | 17 8.5 4 | 15 8.5 5.5 | 16 | 17 2.5 1 | 18 | 19 2.5 2 | 20 | 21 |
| 18 8.5 4.5 | 19 | 20 2.5 0 | 21 | 22 2.5 0 | 23 | 24 8.5 0 | 22 | 23 | 24 0 0 | 25 | 26 0 0 | 27 | 28 |
| 25 8.5 0 | 26 | 27 2.5 0 | 28 | 29 2.5 0 | 30 | 31 8.5 0 | 29 | 30 | 31 | | | | |

**Total Time with AGQ and EDQ = 83.5 Hours**
**Total Time Alone with AGQ and EDQ = 28 Hours**

**Figure 4: Only 28 Hours Alone With AGQ and EDQ.** Calendar with hours spent with AGQ and EDQ during the critical timeframe, demonstrating the absurdity of the sexual abuse allegations against Mr. Quinlan. Green is total hours, and red are the hours spent alone in private.

72.     During the critical timeframe, Mr. Quinlan never once was in the bathroom with AGQ at the same time. AGQ grew in independence during the critical timeframe, using the women's bathroom by herself in public, and using the normal bathroom by herself at home.

73.     Mr. Quinlan's decision to never be with AGQ alone in the bathroom during the critical timeframe was a result of having just dealt with the false allegations of sexual abuse that Ms. Puls and her parents made during the divorce proceedings in the fall of 2022. **Mr. Quinlan was intentionally being hyper-vigilant to avoid any situation that could be maliciously misconstrued by Ms. Puls and her parents.**

74.     Ms. Puls and her parents, Cheryl Puls and Daniel Puls, manipulated the eldest daughter, AGQ, to give sexualized interpretations of innocent events with Mr. Quinlan such as swimming and potty training, fabricating the foundation for the allegations. Ms. Puls, Cheryl Puls, and Daniel Puls encouraged AGQ to fabricate these stories through various rewards, and especially by asking leading and suggestive questions aimed at fabricating incriminating evidence against Mr. Quinlan.

15

75.     Although Ms. Puls and her parents had failed to secure full custody by making these false allegations during the divorce proceedings in Wisconsin, they were successful at stealing full custody of the children by making these same false allegations to authorities in Minnesota through manipulating AGQ.

76.     Ms. Puls' agreement to settle the divorce through mediation was clearly done in bad faith, as her actions show she had no intention of sharing joint custody of the children with Mr. Quinlan or financially cooperating with Mr. Quinlan. As such, this forms the basis of the allegations of breach of contract regarding the divorce settlement agreement.

77.     These false allegations resulted in Ms. Puls obtaining full custody of the children and filing for an Order for Protection ("OFP") in February 2023, which further cut off Plaintiff's access to his children and their medical care.  In her affidavit requesting the OFP, Ms. Puls made several false statements to justify the OFP.  This additional legal barrier has persisted despite Mr. Quinlan getting an acquittal of the criminal charges later in April 2024, causing further unjust separation between Mr. Quinlan and his children.

78.     As a result of the heinous nature of the pending criminal charges, Mr. Quinlan was unable to find employment.  In March 2023, Mr. Quinlan was offered employment as a Java Developer with FD Software for a $110,000 annual salary.  Mr. Quinlan accepted this offer.  However, once FD Software ran a background check, FD Software immediately rescinded their offer due to the criminal charges pending against Mr. Quinlan.

79.     Mr. Quinlan was able to find another job in May 2023 with SaVia Health.  However, Mr. Quinlan was fired after just three months.  Mr. Quinlan believes that his employer discovered the pending criminal charges and that resulted in him losing his job.

80.     Mr. Quinlan has been unable to secure new employment since August 2023.  Compounded with the incredible legal costs Mr. Quinlan has incurred in defending the false allegations of Defendants, he has experienced extreme financial hardship.

16

81.     As part of the criminal proceedings, on August 30, 2023 Mr. Quinlan was granted the discovery request for all recordings of the children created by Ms. Puls or her mother. **Ms. Puls and Cheryl Puls withheld the vast majority of the audio recordings, turning over only about 10%** of the recordings that they made while claiming to have turned over all the information. This malicious deception was obvious upon reviewing the metadata of the recording files, which revealed the original filenames. For example, one file was named "New Recording 103.m4p" suggesting the existence of at least 102 other recordings. **In doing so, Defendants hoped to deny Mr. Quinlan access to exculpatory evidence to increase the likelihood of a wrongful conviction.**

82.     In November 2023, Plaintiff discovered that Ms. Puls most likely has the dangerous mental disorder of Munchausen by Proxy Syndrome ("MBPS"). With this disorder, Ms. Puls is addicted to manipulating the children's medical care to create or exaggerate illnesses in the children because she craves the attention and sympathy she gets as the mother of ill children.

83.     In January 2024, Plaintiff filed a civil lawsuit against UW Health for allowing Ms. Puls to medically abuse the children and failing to recognize the signs of MBPS.  Despite being served with the lawsuit, UW Health proceeded to perform an invasive G-tube surgery on LEQ without verifying that it was medically necessary, further demonstrating the medical abuse that Mr. Quinlan has attempted to prevent. **This surgery was the third major surgery performed on LEQ without Mr. Quinlan's consent, all at the request of Ms. Puls.**

84.     From April 1 to April 8, 2024, Mr. Quinlan underwent a criminal trial on charges based upon the alleged sexual abuse of his daughter, AGQ. **During the trial, the jury evaluated the evidence both for and against Mr. Quinlan, ultimately finding him Not Guilty of any of the charges.**

85.     Mr. Quinlan's primary defense was that Ms. Puls had framed him, and **Ms. Puls did not even show up to contest this with her own testimony.** Further, the overall nature of the evidence was overwhelmingly in favor of Mr. Quinlan. See Trial Transcript of 82-CR-23-361 *State of Minnesota v. Quinlan* for details.

17

86.     Ms. Puls, Cheryl Puls, and Daniel Puls did not testify against Mr. Quinlan at trial.  Instead, Defendants manipulated the eldest daughter, AGQ, into testifying against Mr. Quinlan through a careful and calculated campaign of coaching AGQ to make false claims of sexual abuse.

87.     For example, during the trial, AGQ testified that she had been subjected to manipulative pressure while at her therapy sessions in which Ms. Puls and a therapist at Fraser were trying to "*get it in my brain*," in which AGQ was referring to her being led to make a book as part of brainwashing and controlling AGQ to fabricate incriminating evidence against Mr. Quinlan.

88.     Ms. Puls has also made further false allegations of stalking against Mr. Quinlan throughout 2023 and 2024. For example, she has claimed to need a "Safe at Home" address and claimed that Mr. Quinlan has not followed the restrictions in the Order for Protection that she fraudulently filed. These claims are completely false, and a continuance of her pattern of making false allegations against Mr. Quinlan.

89.     On April 15, 2024, after being acquitted of all criminal charges, Mr. Quinlan promptly filed an Emergency Motion for Full Custody and for strict limitations against Ms. Puls being involved in the healthcare of the children due to the extensive evidence of medical child abuse, the extreme parental alienation, and malicious prosecution instigated by Defendants against Mr. Quinlan.

90.     Despite being acquitted of all charges by a jury in April 2024, Defendants have continued their malicious campaign against Mr. Quinlan.  Their behavior resulted in the initiation of a juvenile case aimed at terminating Plaintiff's parental rights based on the exact same false allegations that had already been evaluated in the criminal trial.

91.     In August 2024, Mr. Quinlan was able to have his evidence of MBPS evaluated by a national expert, Professor Beatrice Yorker, who determined that the evidence shows that the children, especially LEQ, are victims of medical child abuse by the mother Ms. Puls.  Ms. Yorker's findings were written into her affidavit and expert report.

92.     During the discovery phase of the juvenile case, Ms. Puls and Washington County (Minnesota) refused to provide Plaintiff with full access to the children's medical records.  Instead, Ms. Puls and Washington County "cherry-picked" only those medical records that painted Plaintiff in a negative light (aimed at arguing that Mr. Quinlan was opposing medical care of the children) while withholding crucial evidence that would exonerate him.  **Again, Ms. Puls chose to withhold exculpatory evidence from Mr. Quinlan with the hope of causing him to lose his parental rights unjustly.**

93.     Despite withholding exculpatory evidence from Mr. Quinlan, Defendants' third instance of malicious prosecution also ended in his favor, as the case was resolved and Mr. Quinlan's parental rights were not terminated.

94.     Mr. Quinlan has been forced deep into approximately $350,000 of debt to cover all of his legal costs and his loss of employment. In addition to this, Mr. Quinlan's life savings and retirement accounts have also been depleted. All of this financial damage has been the fault of the Defendants conspiracy to destroy Mr. Quinlan and steal his children.

## Part 5: Long History of Attempted Malicious Prosecution

95.     Defendants have acted in concert and as part of a conspiracy to concoct false allegations of domestic violence and sexual abuse against Mr. Quinlan. The following is a summary of the vast quantity of persons that have received verbal and/or written false allegations made by Defendants against Mr. Quinlan.

96.     On November 11, 2019, Defendant Ms. Puls made false allegations of domestic violence against Plaintiff while at a hospital emergency room. After experiencing a miscarriage, she blamed Plaintiff for causing it. Hospital staff called the police, but no charges were filed.

97.     On November 25, 2019, Defendant Ms. Puls made false allegations to Child Protective Services (CPS), claiming that Plaintiff physically abused her and their child, EDQ. CPS investigated the allegations but ultimately dropped the case. Plaintiff incurred approximately $10,000 in related costs.

98.    On June 15, 2020, Defendant Ms. Puls called the Madison Police Department and falsely insinuated that Plaintiff was stealing or destroying her packages. No charges were filed, and there was no CPS involvement.

99.    On April 17, 2021, Defendants Cheryl and Daniel Puls made false allegations of domestic violence against Plaintiff during a dispute over a children's playset. These allegations were reported to both police and CPS. CPS screened out the report, and no charges resulted. Plaintiff incurred approximately $10,000 in related costs.

100.    On May 26, 2021, Defendant Ms. Puls called the police after Plaintiff confronted her about faking a bloody nose during an incident on May 18, 2021. No charges were filed, and there was no CPS involvement.

101.    On May 26, 2021, Defendant Ms. Puls made false allegations of child abuse to both a healthcare provider and Child Protective Services (CPS). She falsely claimed that Plaintiff's mother had harmed LEQ. CPS screened out the report, and no charges were filed.

102.    On October 5, 2021, Defendant Cheryl Puls made a report directly to CPS alleging various forms of physical child abuse against Plaintiff. The allegations screened out by CPS, and no charges were filed.

103.    On October 25, 2021, Defendant Ms. Puls made a report directly to CPS alleging that Plaintiff had committed sexual child abuse against AGQ. The story stemmed from Ms. Puls giving AGQ a bath and asking her leading questions about her time with Plaintiff. CPS screened out the report, and no charges were filed.

104.    On October 26, 2021, Defendant Cheryl Puls made a report directly to CPS alleging sexual child abuse of AGQ by Plaintiff. Cheryl Puls' report mirrored the details of the CPS report made by Defendant Ms. Puls the previous day, suggesting at least one of the reports was fabricated. CPS screened out this report, and no charges were filed.

105.    On February 23, 2022, during divorce proceedings in Wisconsin Family Court, Defendant Ms. Puls made false allegations of child abuse against Plaintiff. She claimed that Plaintiff was abusing the children by preventing LEQ from undergoing a surgery and by feeding EDQ and AGQ foods to which they were allergic. Plaintiff incurred approximately $10,000 in related legal costs.

106.    On June 1, 2022, Defendant Ms. Puls made false allegations of domestic violence against Plaintiff in Wisconsin Family Court. She claimed that she had frequently gone to the emergency room with "broken bones" caused by Plaintiff. She also reasserted earlier false allegations of child abuse, originally made in February 2022. Plaintiff incurred approximately $10,000 in related legal costs.

107.    Throughout September and October 2022, Defendant Ms. Puls and her parents made numerous false allegations of domestic violence, sexual abuse, child abuse, and sexual child abuse to Shelly Anday, a professional investigator hired for the divorce proceedings. Ms. Puls and her parents also manipulated the children into making incriminating statements against Plaintiff while recording them to fabricate evidence. Plaintiff incurred approximately $8,000 in related costs.

108.    On October 11, 2022, Defendant Cheryl Puls sent an inflammatory email to Shelly Anday. The email made numerous false accusations, including allegations that Plaintiff had sexually abused all three of his children. Mr. Quinlan was able to respond and refute her reckless allegations due to Shelly Anday's professional investigation.

109.    On October 25, 2022, Defendants Cheryl and/or Ms. Puls made a false report to CPS alleging sexual abuse of AGQ by Plaintiff. The report frequently cited statements AGQ allegedly made, which were the result of leading questions and positive reinforcement of incriminating stories. CPS screened out the report, and no charges were filed.

110.    On October 31, 2022, Defendants Cheryl and/or Ms. Puls made another false report to CPS alleging sexual abuse by Plaintiff. This report was nearly identical to the report filed on October 25, 2022. CPS screened out the report, and no charges were filed.

111.    On January 10, 2023, Defendant Ms. Puls made false allegations of sexual child abuse against Plaintiff to Dr. Catherine Sleeth, the children's primary care physician, during a doctor's appointment in Madison, Wisconsin.

112.    On January 19, 2023, Defendant Ms. Puls made false allegations of sexual child abuse against Plaintiff to Amanda Mann, a social worker at AGQ's elementary school. These allegations led to a formal investigation and subsequent prosecution.

113.    On January 25, 2023, Defendant Ms. Puls contacted therapist Nicole Koenke at Points of Stillness, accusing Plaintiff of sexually abusing AGQ. The therapist asked AGQ a few questions and found no reason for concern.

114.    On January 26, 2023, Defendant Ms. Puls enthusiastically gave an interview to Police Detective Kim Richardson and CPS Investigator Hailey Dornfeld. The interview was triggered by Defendant Ms. Puls' earlier manipulation of Amanda Mann. During the interview, she made numerous false allegations of sexual abuse of all three children by Plaintiff. These allegations were investigated and prosecuted, costing Plaintiff approximately $200,000.

115.    On February 3, 2023, Defendant Ms. Puls submitted an affidavit to Minnesota Family Court requesting an Order for Protection against Plaintiff. In the affidavit, she made numerous false allegations of physical and sexual abuse against herself and the children, committing perjury several times. Plaintiff incurred approximately $40,000 in legal costs related to this proceeding.

116.    On December 6, 2023, Defendant Ms. Puls participated in a deposition conducted by attorney Beau McGraw, with her own counsel present. Under oath, Defendant Ms. Puls reaffirmed many of her past false allegations of physical and sexual abuse of herself and the children by Plaintiff. These statements were frequently inconsistent, and Defendant Ms. Puls committed perjury by lying under oath several times during this deposition.

117.    On April 19, 2024, Defendant Ms. Puls called CPS and again accused Plaintiff of sexually abusing AGQ. This allegation came shortly after Plaintiff's acquittal in his trial on April 8, 2024. CPS screened out the report, and no charges were filed.

118.    On August 15, 2024, Defendant Ms. Puls made false allegations of physical and sexual abuse by Plaintiff against herself and the children to her therapist, Sara Haubrich. The purpose of these allegations was to fraudulently obtain a diagnosis of PTSD and Generalized Anxiety Disorder, while attempting to counter Plaintiff's allegations that Defendant Ms. Puls has MBPS (aka Factitious Disorder Imposed on Another), a dangerous mental health disorder.

119.    **In total, Defendants have made a total of at least 22 attempts at instigating Malicious Prosecution of Plaintiff**. In every scenario, Defendants claims have been completely baseless and false, made with malice, for the improper purpose of stealing the children away from Plaintiff and harming Plaintiff.

120.    Out of these 22 attempts at instigating Malicious Prosecution, Defendants have caused the generation of **at least 11 CPS reports in either Dane County Wisconsin or Washington County Minnesota**. While most of these CPS reports were screened out, several of them were seriously investigated by CPS, causing severe harm to Plaintiff.

121.    In addition to these 22 attempts at instigating malicious prosecution, and 11 CPS reports, **there were 2 instances in which Defendants successfully brought about the instigation of criminal charges against Plaintiff**. The first was in April 2021 in Dane County Wisconsin, and the second was in January 2023 in Washington County Minnesota. Both criminal charges were defeated as they had no basis in reality because they were based upon fabricated claims by Defendants.

122.    In addition to these 2 criminal charges, the serial attempts at malicious prosecution also drastically increased the overall cost and length of the divorce proceedings, causing further unnecessary harm to Plaintiff.

123.    Defendants have a clearly established history and pattern of making false allegations of abuse against Mr. Quinlan. This pattern is well established by at least these 22 specific examples of attempts at malicious prosecution. This pattern spans a lengthy timeframe from November 2019 to the present.

124.    Defendants have demonstrated that they are willing to commit perjury by lying in affidavits and lying under oath. Defendants have lied to the Police multiple times. Defendants have lied to Healthcare professionals many times. **Defendants have no hesitation in sacrificing their integrity to get what they want, and it is time for them to be held accountable for their reckless behavior.**

## Part 6: Extensive Campaign of Defamation and Slander

125.    Over the past several years, from 2019 to the present, Defendants have engaged in a relentless and widespread campaign of defamation against Mr. Quinlan. Through frequent and damaging statements, they have repeatedly spread false and malicious allegations about him to numerous third parties.

126.    Throughout 2022, 2023 and 2024 Ms. Puls made frequent and numerous false allegations against Mr. Quinlan of physical and/or sexual abuse against herself and/or the children to Healthcare providers at Points of Stillness, in Hudson WI. Primary therapists: Nancy Lawton-Shirley, Lynsey Batenhorst, Teresa Gillen, Jennifer Bialik, Andrea Cronk, and Allison Gilbert.

127.    Throughout 2023 and 2024 Ms. Puls made frequent and numerous false allegations against Mr. Quinlan of physical and/or sexual abuse against herself and/or the children to Healthcare providers at Fraser in Woodbury MN. Primary therapists: Kallie Uner, Sarah Ludwig, Tarah Groettum, and Sara Haubrich.

128.    Throughout 2019, 2020, 2021, 2022, 2023 and 2024 Ms. Puls made frequent and numerous false allegations against Mr. Quinlan of physical and/or sexual abuse against herself and/or the children to Healthcare providers at UW Health in Madison WI. Primary providers: Timothy Chybowski, Catherine

Sleeth, Michael Puricelli, Alexa Beversdorf, Istvan Danko, Jane Lyon, Kathleen Maginot, Raheel Ahmed, Nicole Weathers, and Amy Wilkins.

129.    Throughout 2023 and 2024 Ms. Puls made frequent and numerous false allegations against Mr. Quinlan of physical and/or sexual abuse against herself and/or the children to therapist Ruth Linda at St. Croix Therapy in Hudson WI.

130.    Throughout 2023 and 2024 Ms. Puls made frequent and numerous false allegations against Mr. Quinlan of physical and/or sexual abuse against herself and/or the children to therapist Rebecca Long at Pediatric Home Service in MN.

131.    Throughout 2019, 2020, 2021, 2022, 2023 and 2024 Ms. Puls and her parents all made frequent and numerous false allegations against Mr. Quinlan of physical and/or sexual abuse against Ms. Puls and/or the children to friends and family members. The quantity of friends and family members that heard these slanderous allegations is between 10 to 100 persons, possibly more.

132.    Throughout 2022, 2023 and 2024 Ms. Puls made frequent and numerous false allegations against Mr. Quinlan of physical and/or sexual abuse against herself and/or the children to multiple educational staff in Washington County that were involved with the children's educational activities.

133.    Defendants, particularly Ms. Puls, have engaged in a persistent and far-reaching campaign of slander against Mr. Quinlan, making numerous false allegations of physical and sexual abuse against both herself and the children. **These defamatory statements have been shared with an extensive array of individuals, including healthcare providers, therapists, educators, friends, and family members, spanning the years 2019 through 2024.**

134.    The individuals and institutions listed here represent only a portion of those targeted by Defendants' defamatory campaign. It is likely that many additional healthcare providers, educators, and community members were similarly exposed to false allegations, underscoring the pervasive nature of Defendants' malicious conduct.

## Part 7: Extremely Threatening Behavior and Evidence of Conspiracy

135.    Ms. Puls provides an abundance of evidence supporting the existence of a conspiracy between herself and her parents as well as the approximate terms of the agreement. Further, the existence of this conspiracy is clearly evident based upon the actions of the parties.

136.    Starting as early as 2019, Ms. Puls started making verbal and written threats to Mr. Quinlan that explicitly stated that she and her parents were plotting to separate Mr. Quinlan from his children and instigate malicious prosecution using CPS and the Police.

137.    On December 10, 2019, Ms. Puls explicitly threatened Mr. Quinlan, stating "*Okay. I will schedule a new appointment with CPS and tell them the full truth, get the pictures and recordings from my parents, **this will be a full out war!**" This message underscores the orchestrated nature of their actions, demonstrating a coordinated effort to fabricate and escalate claims to authorities.

138.    On May 28, 2020, Ms. Puls revealed her parents' involvement in strategizing against Mr. Quinlan, stating, "*I finally convinced my parents not to call the police on you. **However, they have talked with professionals about how to remove us from you.**" This illustrates a calculated approach by Ms. Puls and her parents to find legal or extralegal methods to separate Mr. Quinlan from his family, despite the absence of justification for such actions.

139.    On April 25, 2021, Ms. Puls sent another text, boasting, "***I could have had things done to you. So could have my parents***, *but we know that it would compromise [LEQ]'s care.*" This message suggests a willingness and prior discussions with her parents to take hostile actions against Mr. Quinlan, tempered only by their concern for optics or strategic drawbacks, rather than a lack of intent.

140.    Over the past six years, Ms. Puls has sent Mr. Quinlan an extraordinary number of text messages—over 31,000 in total. Among these messages, at least 70 explicitly involve threats to involve the police in situations fabricated or manipulated to harm Mr. Quinlan's reputation or standing. Many of these threats were aimed at escalating disputes or forcing compliance with her demands, showcasing her willingness to weaponize law enforcement against him.

26

141.    In addition to involving the police, Ms. Puls frequently threatened Mr. Quinlan with the involvement of her parents, sending at least 31 messages where she detailed how they would assist her in taking action against him. These messages illustrate the deeply collaborative nature of the Defendants' actions and their shared intent to conspire against Mr. Quinlan.

142.    The children were also a frequent subject of Ms. Puls' threats. At least 54 messages contain explicit threats involving the children, including the possibility of restricting his access to them, manipulating custody arrangements, or using them as leverage in disputes. These threats are particularly egregious as they weaponized the children in ongoing conflicts, demonstrating a deliberate effort to alienate Mr. Quinlan from his parental rights and responsibilities.

143.    A significant portion of the threats targeted Mr. Quinlan's livelihood and financial stability. At least 60 messages directly referenced his job security, **suggesting that Ms. Puls intended to harm his career or professional reputation as part of her campaign.** Additionally, at least 37 messages involved threats to report him to Child Protective Services (CPS), further reflecting her intent to exploit institutional processes to harm him and gain control over the children.

144.    The nature of these messages often crossed into abusive territory. At least 18 messages contain explicitly abusive insults directed at Mr. Quinlan, while 50 other messages involved attacks on him through references to other individuals. These insults and external references were clearly intended to degrade and humiliate Mr. Quinlan, adding emotional harm to the already substantial legal and financial pressures caused by the Defendants' actions.

145.    Together, this extensive record of text messages paints a clear picture of a sustained campaign of threats, intimidation, and manipulation. The frequency and variety of the threats—from involving law enforcement and CPS to targeting Mr. Quinlan's career and children—**reveal the systematic and conspiratorial nature of the Defendants' actions**. This toxic combination of written threats, verbal abuse, and deliberate follow-through on many of these threats underscores the Defendants' collective intent to harm Mr. Quinlan and alienate him from his children.

146.    During the deposition on December 6, 2023, Ms. Puls testified about parenting time between Mr. Quinlan and LEQ that took place at the Woodbury Public Library in fall of 2022. Ms. Puls raised sexual abuse suspicions about Mr. Quinlan taking LEQ into the bathroom during visitation. **Further, she testified that her parents initially suggested she should be worried about sexual abuse of LEQ, thereby shaping her subsequent suspicions and actions.**

147.    In February 2022 Cheryl and Daniel Puls purchased a house for Ms. Puls and the children located at 3201 Country Side Court, Unit B, Woodbury, MN 55129, following the separation between Mr. Quinlan and Ms. Puls. By doing so, they ensured that Ms. Puls and the children remained under their direct influence and control. Providing housing at no cost to Ms. Puls freed her from financial pressures, enabling her to focus on a sustained campaign to undermine Mr. Quinlan both legally and personally.

148.    Cheryl and Daniel Puls possess substantial financial resources, making them fully capable of supporting Ms. Puls and the children without any assistance from Mr. Quinlan. This financial independence removed any deterrence they might have had about pursuing actions designed to harm Mr. Quinlan financially. Their wealth enabled them to absorb the costs of legal battles, provide housing, and meet the daily needs of Ms. Puls and the children, reinforcing their commitment to their conspiratorial efforts.

149.    Cheryl and Daniel Puls derive significant control over Ms. Puls and the children due to Ms. Puls' complete dependence on them for finances, housing, child care, legal services, and social connections. This dynamic has allowed them to exercise significant influence over Ms. Puls' decisions and actions, ensuring that their objectives align in their campaign against Mr. Quinlan.

## Part 8: Severe Harm to Plaintiff and the Children

150.    The Defendants' malicious actions, including the instigation of baseless legal proceedings, have imposed devastating financial burdens on Mr. Quinlan. Since January 2023, these actions have directly resulted in over $165,000 in legal fees, including costs for attorneys, bail, and associated court

expenses. Additionally, Mr. Quinlan has incurred $35,000 in expert witness fees, which were necessary to defend against the false allegations and to counter the Defendants' manipulation of legal processes.

151.    The financial harm extends beyond legal expenses. Due to the relentless nature of the malicious prosecution and the resulting reputational damage, Mr. Quinlan has been unable to work for the past two years. This inability to maintain employment has resulted in a staggering loss of approximately $260,000 in income, calculated at his prior earning rate of $130,000 per year. The financial strain has further been compounded by the depletion of Mr. Quinlan's personal savings and retirement accounts, which total an additional loss of approximately $70,000.

152.    To manage these overwhelming costs, Mr. Quinlan has been forced to rely on financial assistance from his family, amounting to approximately $291,000 in loans. These loans have accrued significant interest, further increasing his financial obligations. The compounded interest on these loans amounts to $44,000, highlighting the long-term financial repercussions of the Defendants' actions.

153.    The direct and indirect financial damages caused by the Defendants' malicious conduct total well over half a million dollars. These figures underscore the extensive harm inflicted on Mr. Quinlan, not only in terms of his legal and financial stability but also in his ability to rebuild his life after enduring the Defendants' prolonged campaign of deceit and prosecution.

154.    The Defendants' actions have not only inflicted significant financial and emotional harm on Mr. Quinlan but have also caused profound harm to the three minor children. The malicious legal actions and relentless campaign against Mr. Quinlan have robbed the children of financial security and their fundamental right to a relationship with their father.

155.    Financially, the Defendants' actions have drained resources that would otherwise have been invested in the children's futures. The legal costs and associated expenses—totaling over half a million dollars—could have funded each child's college education multiple times. Instead, these resources were diverted to defending against false allegations from Defendants. This loss is not just monetary but represents a theft of the children's future financial security.

156.    Emotionally, the children have suffered irreparable harm due to the Defendants' deliberate alienation of Mr. Quinlan. The Defendants' actions have deprived the children of the love, guidance, and stability that come from a healthy relationship with their father. This parental alienation has inflicted deep psychological trauma, leaving the children confused, manipulated, and emotionally vulnerable. The damage caused by severing a critical familial bond is incalculable, affecting their emotional well-being, sense of identity, and future relationships.

157.    Moreover, the children have endured significant medical harm, particularly LEQ, who has been subjected to rampant medical child abuse orchestrated by Ms. Puls. These actions, which involve unnecessary medical treatments and fabricated illnesses, have placed the children at risk of long-term physical and psychological damage. LEQ, in particular, has been subjected to repeated invasive procedures, unnecessary medications, and manipulative medical narratives crafted by Ms. Puls to garner attention or strengthen her false claims against Mr. Quinlan. This behavior constitutes not only abuse but a betrayal of the trust and care a parent is expected to provide.

158.    The collective harm to the children—financial, emotional, and medical—is a direct result of the Defendants' malicious and reckless actions. Their campaign against Mr. Quinlan has not only targeted him but has devastated the well-being of the children, leaving them with scars that may take years to heal, if ever.

159.    As a direct result of the Defendants' malicious and tortious actions, Carsten J. Quinlan has endured extensive financial devastation, profound emotional suffering, irreparable damage to his reputation, and the heartbreaking loss of a meaningful relationship with his children. Simultaneously, the Defendants' conduct has inflicted severe financial, psychological, and medical harm upon the children, depriving them of stability, safety, and the invaluable presence of their father in their lives.

## COUNT I
## 42 U.S.C. § 1983 (Due Process) – All Defendants

160.    Plaintiff repeats and realleges paragraphs 1 through 159 as set forth above.

161.    As a result of his status as parent of the three minor children, Carsten J. Quinlan had a liberty interest in having a custodial and companionship relationship with his children.

162.    In the manner described more fully above, Defendants individually, jointly, and in conspiracy with one another, acted to deprive Plaintiff of his liberty interest in having a relationship with his children, without due process of law and in violation of his rights secured by the U.S. Constitution.

163.    Further, Defendant's tortious acts were done "*under color of law*" by manipulating governmental authorities and abuse of legal processes to steal full control over the children.

164.    The misconduct of Defendants was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

165.    As a result of the Defendants' misconduct, Plaintiff was deprived of his parental relationship with his children and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

166.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## <u>COUNT II</u>

## 42 U.S.C. § 1983 (Second Amendment) – Defendant Ms. Puls

167.    Plaintiff repeats and realleges paragraphs 1 through 166 as set forth above.

168.    As a result of the fraudulent and knowingly false statements made by Defendant Ms. Puls in her affidavit from February 3, 2023, Plaintiff was subjected to an Order for Protection (OFP) that included a restriction on his constitutional right to possess firearms.

169.    In the manner described more fully above, Defendant Ms. Puls, individually and in concert with state authorities, acted to deprive Plaintiff of his Second Amendment right to keep and bear arms, as secured by the U.S. Constitution and incorporated against the states via the Fourteenth Amendment.

31

170.    Further, Defendant's tortious acts were done "*under color of law*" by knowingly manipulating governmental authorities and legal processes to impose unjust restrictions on Plaintiff's constitutional rights.

171.    The misconduct of Defendant was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

172.    As a result of Defendant's misconduct, Plaintiff was deprived of his Second Amendment rights and suffered stigma, emotional distress, and reputational harm, along with other injuries and damages as set forth above.

173.    WHEREFORE, Plaintiff demands judgment against Defendant in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT III

## 42 U.S.C. § 1983 (First Amendment) – All Defendants

174.    Plaintiff repeats and realleges paragraphs 1 through 173 as set forth above.

175.    As a result of his status as parent of the three minor children, Carsten J. Quinlan exercised his First Amendment rights to associate with his children, communicate freely about matters affecting his family, and petition the government for redress of grievances. These rights also included the ability to speak with his children's doctors, therapists, and other professionals involved in their care to ensure their well-being.

176.    In the manner described more fully above, Defendants individually, jointly, and in conspiracy with one another, acted to interfere with and suppress Plaintiff's First Amendment rights. Defendants' actions included the initiation of false legal proceedings, manipulation of governmental authorities, and dissemination of false allegations. Defendants' actions were intended to isolate Plaintiff

from his children, silence him, and prevent him from effectively participating in decisions related to his children's medical and therapeutic care.

177.    Specifically, Defendants obstructed Plaintiff's ability to communicate with his children's doctors and therapists by providing false information to these professionals, manipulating legal processes to restrict Plaintiff's access, and creating a hostile environment that made direct communication impossible. These actions interfered with Plaintiff's ability to advocate for his children's well-being and exercise his constitutional rights.

178.    Further, Defendants' tortious acts were done "*under color of law*" by manipulating governmental authorities and abusing legal processes to impede Plaintiff's constitutional rights.

179.    The misconduct of Defendants was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

180.    As a result of the Defendants' misconduct, Plaintiff was deprived of his First Amendment rights and suffered great mental and emotional anguish, reputational harm, and other grievous and continuing injuries and damages as set forth above.

181.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## <u>COUNT IV</u>
## Conspiracy – All Defendants

182.    Plaintiff repeats and realleges paragraphs 1 through 181 as set forth above.

183.    All Defendants, and each of them, reached an agreement amongst themselves to harm Plaintiff.

184.    Defendants agreed to the following approximate terms for their conspiracy: Ms. Puls' parents, Cheryl Puls and Daniel Puls, have agreed to provide Ms. Puls with financial resources, living accommodations, childcare, and similar assistance.  They have also agreed to help Ms. Puls conceal and

indulge in her addiction to medical services and attention. In return, Ms. Puls agreed to obtain full custody of the children from Mr. Quinlan to share with her parents. As a result, Ms. Puls and her parents have established a living agreement in which they both enjoy unfettered access and control over the children without Mr. Quinlan being involved.

185.    **This Conspiracy fundamentally amounts to the human trafficking crime of Ms. Puls kidnapping the children from Mr. Quinlan and selling them to Daniel Puls and Cheryl Puls.** In exchange for defrauding Mr. Quinlan of his access to his own children, Ms. Puls has been financially rewarded by her parents, who enjoy daily engagement with the children.

186.    The conspiracy between Defendants facilitated the following crimes (Under Minnesota Statutes, with similar crimes in Wisconsin) against Plaintiff and against the children:

      a.  **609.25 KIDNAPPING**

      b.  **609.26 DEPRIVING ANOTHER OF CUSTODIAL OR PARENTAL RIGHTS**

      c.  **609.378 NEGLECT OR ENDANGERMENT OF CHILD**

      d.  **609.48 PERJURY**

      e.  **609.498 TAMPERING WITH WITNESS**

      f.  **609.505 FALSELY REPORTING CRIME**

      g.  **609.507 FALSELY REPORTING CHILD ABUSE**

187.    Such a clear criminal arrangement can falsely appear socially appropriate only if the Defendants also heavily slander and attack Mr. Quinlan to argue to various authorities, friends, and family members that their full possession of the children is justified.

188.    Defendants agreed to engage in a course of conduct involving false allegations of abuse, manipulation of the children, and misleading statements to law enforcement, child protective services, and courts of law, with the intent of achieving their unlawful objective of alienating Plaintiff from his children and obtaining full control over their lives.

189.    Defendants committed overt acts in furtherance of the conspiracy, including but not limited to making false reports of abuse, providing perjured testimony, and withholding material information during legal proceedings.

190.    Each of the co-conspirators were willful participants in joint action.

191.    Defendant's illegal agreement, malicious plotting, and collection of overt acts were mostly successful toward the end of destroying Mr. Quinlan and stealing full control over his children.

192.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally to cause harm to Plaintiff and with willful indifference to Plaintiff's rights.

193.    As a direct and proximate result of the illicit agreement and overt acts referenced above, Plaintiff was deprived of his relationship with his children, and suffered great mental and emotional anguish and other grievous and continuing injuries and damages.

194.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT V
### Defamation – All Defendants

195.    Plaintiff repeats and realleges paragraphs 1 through 194 as set forth above.

196.    At all relevant times to the events described above, Defendants, and each of them, stated that Plaintiff committed acts of domestic violence against his family.

197.    At all relevant times to the events described above, Defendants, and each of them, stated, verbally and/or in writing, that Plaintiff committed acts of sexual abuse against his children and Ms. Puls.

198.    At all relevant times to the events described above, Defendants, and each of them, stated, verbally and/or in writing, that Plaintiff committed acts of domestic violence and sexual abuse.

199.    The statements made by Defendants that Plaintiff committed acts of domestic violence and sexual abuse are categorically false.

200.    Defendants, and each of them, either knew their statements were false, or acted with reckless disregard for the truth, or both.

201.    As a direct and proximate result of Defendants' actions, Plaintiff was deprived of his relationship with his children, and suffered great mental and emotional anguish and other grievous and continuing injuries and damages.

202.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## **COUNT VI**
## **Negligence – All Defendants**

203.    Plaintiff repeats and realleges paragraphs 1 through 202 as set forth above.

204.    At all times relevant to the events described above, the Defendants, and each of them, had a duty of care to exercise ordinary and reasonable care to refrain from any act which will cause foreseeable harm to Plaintiff, and to refrain from any act which creates an unreasonable risk to Plaintiff.

205.    Defendants breached that duty by making false allegations of abuse, manipulating the children, withholding crucial information about their medical care, and initiating unfounded legal actions against Plaintiff.

206.    Defendants' actions were negligent in that they acted without reasonable care for the truth of the allegations and without considering the harm their actions would cause to Plaintiff.

207.    Defendants breached their duty of ordinary care as a result of their negligent actions.

208.    As a direct and proximate result of Defendants' actions, Plaintiff was deprived of his relationship with his children, and suffered great mental and emotional anguish and other grievous and continuing injuries and damages.

209.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT VII
## Fraud and Misrepresentation – All Defendants

210.    Plaintiff repeats and realleges paragraphs 1 through 209 as set forth above.

211.    Defendants, and each of them, have made numerous representations to various parties that are false and untrue, and were known by all Defendants to be false at the time they were made.

212.    Defendants, and each of them, have made representations and claims that were also known to be false and untrue, which pertained to Plaintiff, and which claims were either known or reasonably ascertained by Defendants to be untrue.

213.    The Defendants have made these representations with the intent to deceive or defraud other parties with substantial authority, such as Healthcare providers, the Police and CPS in both Wisconsin and Minnesota.

214.    These other parties have frequently relied upon these false statements and misrepresentations of Defendants to harm and damage Mr. Quinlan, as Defendants intended.

215.    These other parties have frequently relied upon these false statements and misrepresentations of Defendants to reward Defendants with resources, favor, and full control of the children, as Defendants intended.

216.    That as a direct and proximate cause of the intentional and fraudulent representations of all Defendants, Plaintiff was deprived of his relationship with his children, and suffered great mental and emotional anguish and other grievous and continuing injuries and damages.

217.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT VIII
## Malicious Prosecution – All Defendants

218.    Plaintiff repeats and realleges paragraphs 1 through 217 as set forth above.

219.    Defendants, and each of them, have maliciously initiated legal proceedings against Plaintiff multiple times, as specified above.

220.    In all cases in which Defendants have initiated legal proceedings against Plaintiff, their allegations have been entirely false and without merit.

221.    In all cases in which Defendants have initiated legal proceedings against Plaintiff, Defendants knew their allegations were false and without merit, or acted with reckless disregard for the truth, or both.

222.    In all cases in which Defendants have initiated legal proceedings against Plaintiff, Defendants have acted with malice toward Plaintiff.

223.    Defendants maliciously, intentionally, willfully, and recklessly abused any available legal processes they could toward the end of harming Plaintiff and stealing full custody of the children.

224.    In all cases in which Defendants have initiated legal proceedings against Plaintiff, the legal proceedings were terminated in his favor.

225.    The specific instances of malicious prosecution claimed are the following:

   a. **2021CM000844 – Dane County WI, April 2021 through October 2021:** Criminal charges of disorderly conduct filed and prosecuted against Mr. Quinlan. Case ended in favor of Mr. Quinlan when it was unconditionally dismissed.

   b. **2021FA001002 – Dane County WI, May 2021 through December 2022:** Divorce proceedings in which Defendants collectively made false allegations of child abuse as leverage in divorce proceedings with the objective of stealing full custody of the children. This ended in Plaintiff's favor when the investigation by Shelly Anday refuted

the false allegations and the settlement agreement awarded joint custody of the children.

    c. **82-CR-23-361 – Washington County MN, January 2023 through April 2024:** This is by far the most egregious and harmful instance of malicious prosecution orchestrated by Defendants in which criminal charges of Criminal Sexual Contact with a Minor were charged to Mr. Quinlan due to malicious acts of Defendants. This case also ended in favor of Mr. Quinlan when the jury acquitted Mr. Quinlan of all charges in April 2024.

    d. **82-JV-24-220 – Washington County MN, April 2024 through October 2024:** The juvenile case against Mr. Quinlan was initiated based upon the exact same fabricated grounds as the criminal case from January 2023. Defendants initiated this case for the purpose of terminating Mr. Quinlan's parental rights. This case ultimately was settled in favor of Mr. Quinlan because his parental rights were not terminated.

226.    That as a direct and proximate cause of the multiple instances of malicious prosecution initiated by all Defendants, Plaintiff was deprived of his relationship with his children, and suffered great mental and emotional anguish and other grievous and continuing injuries and damages.

227.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## <u>COUNT IX</u>
### Abuse of Process – All Defendants

228.    Plaintiff repeats and realleges paragraphs 1 through 227 as set forth above.

229.    The Defendants, and each of them, did wrongly threaten, file, and instigate legal actions and abuse legal processes toward the end of harming Plaintiff.

230.    The Defendants, and each of them, intentionally used a wide variety of legal procedures, statutes, governmental aid systems, and similar processes in a manner that those processes were not intended, and with fraud, and toward the end of harming Plaintiff.

231.    For example, Cheryl Puls and Daniel Puls relied upon mandatory arrest statutes in Wisconsin to force the Police to arrest and prosecute Mr. Quinlan in April 2021.

232.    For another example, in February 2023, Ms. Puls fraudulently filed for an Order for Protection in order to alienate Mr. Quinlan from his children.

233.    For both of these examples, Defendants abused legal processes designed to protect real victims of domestic violence for the wrongful purpose of harming Plaintiff and separating him from his children.

234.    These two examples are not exhaustive of all instances of abuse of process by Defendants.

235.    That as a direct and proximate cause of the various abuses of process by all Defendants, Plaintiff was deprived of his relationship with his children, and suffered great mental and emotional anguish and other grievous and continuing injuries and damages.

236.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## <u>COUNT X</u>
### Negligent Infliction of Emotional Distress – All Defendants

237.    Plaintiff repeats and realleges paragraphs 1 through 236 as set forth above.

238.    At all times relevant to the events described above, the Defendants, and each of them, had a duty of care to exercise ordinary and reasonable care to refrain from any act which will cause unwarranted emotional distress to Plaintiff.

239.    At all times relevant to the events described above, the Defendants, and each of them, acted without ordinary care or as a person in their conduct described herein.

240.    All of the conduct described herein by Defendants, a reasonable person would recognize as creating an unwarranted and unacceptable risk of injury to Plaintiff.

241.    As a proximate result of Defendants' negligent conduct, Plaintiff suffered severe emotional distress.

242.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT XI
## Willful & Wanton Misconduct – All Defendants

243.    Plaintiff repeats and realleges paragraphs 1 through 242 as set forth above.

244.    At all times relevant to the events described above, the Defendants, and each of them, acted in making false allegations against Plaintiff and showed a conscious disregard for the truth and acted with malicious intent.

245.    Defendants acted with an intentional disregard for the rights of Plaintiff.

246.    As a result of the Defendants' misconduct, Plaintiff was deprived of his relationship with his children and suffered great mental and emotional anguish and other grievous and continuing injuries and damages.

247.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT XII
## Harassment – All Defendants

248.    Plaintiff repeats and realleges paragraphs 1 through 247 as set forth above.

41

249.     At all times relevant to the events described, Plaintiff had a right to be free from intentional and repeated conduct by others that was intended to harass, intimidate, or cause emotional distress.

250.     The Defendants, and each of them, engaged in a continuous pattern of harassment against Plaintiff, including but not limited to:

- Repeated instances of physical aggression, including unwanted physical contact by Defendant Daniel Puls in November 2019 and again on April 17, 2021.

- Verbal threats and intimidation, such as Defendant Daniel Puls' statement in January 2023 at the public library, where he threatened Plaintiff by insinuating that Plaintiff was "*a problem*" that he would "*get rid of.*"

- Attempts to provoke physical confrontations, as seen when Defendant Cheryl Puls intentionally blocked Plaintiff's path on April 17, 2021, escalating the situation and leading to physical aggression by Defendant Daniel Puls.

- Multiple acts by Defendant Ms. Puls, including physical assaults on October 4, 2018, and December 19, 2019, designed to provoke Plaintiff into retaliating and subjecting him to potential false accusations of domestic violence.

251.     The conduct of all Defendants was intentional, without legitimate purpose, and undertaken with the goal of causing Plaintiff emotional distress, fear, and intimidation.

252.     Defendants' repeated and continuous harassment of Plaintiff caused him significant emotional distress, anxiety, and fear for his personal safety. The actions of Defendants disrupted Plaintiff's life and interfered with his ability to exercise his rights as a parent.

253.     The pattern of harassment exhibited by Defendants was severe, pervasive, and outrageous, exceeding the bounds of decency tolerated by society.

254.     WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT XIII
## Tortious Interference – Cheryl and Daniel Puls

255.    Plaintiff repeats and realleges paragraphs 1 through 254 as set forth above.

256.    At all relevant times during the marriage of Mr. Quinlan and Ms. Puls, Plaintiff had a reasonable expectation of entering into a marital contract with Ms. Puls and enjoying marital life without interference, manipulation, and undermining by third parties.

257.    At all relevant times during their marriage, Defendants Cheryl Puls and Daniel Puls knew of Plaintiff entering into marriage with Ms. Puls and the expectation that Plaintiff would be free to enjoy married life without interference, manipulation, and undermining.

258.    Defendants Cheryl Puls and Daniel Puls willfully and intentionally interfered with Plaintiff's marital relationship with Ms. Puls by continuously involving themselves in private marital matters, encouraging Ms. Puls to act against Plaintiff's interests, and undermining the stability of the marriage.

259.    Defendants Cheryl Puls and Daniel Puls' interference included encouraging Ms. Puls to escalate minor disagreements into serious conflicts, making false allegations against Plaintiff, and providing false information to law enforcement and other authorities to harm Plaintiff.

260.    As a direct and proximate result of Defendant Cheryl Puls and Daniel Puls' interference, Plaintiff's marital relationship was severely harmed, contributing toward divorce, emotional distress, and great financial losses.

261.    Defendants' interfering acts were done willfully, or with a wanton disregard for the rights of Plaintiff, especially his parental rights.

262.    Plaintiff suffered personal and pecuniary damages, and harm to his reputation, as a result of Defendants' tortious interference.

263.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT XIV
## Assault and Battery – Cheryl and Daniel Puls

264.    Plaintiff repeats and realleges paragraphs 1 through 263 as set forth above.

265.    At all times relevant to the events described above, Plaintiff had a right to be free from unwanted, offensive, and harmful physical contact, as well as a right to be free from acts causing reasonable apprehension of imminent harm.

266.    On multiple occasions, Defendant Daniel Puls intentionally engaged in conduct that resulted in harmful and offensive physical contact with Plaintiff. For example, in November 2019 Daniel Puls forced his way into Plaintiff's home by pushing Plaintiff aside after being denied entry, thereby committing battery. Further, on April 17, 2021, Daniel Puls attacked Plaintiff from behind, putting Plaintiff in a headlock while shouting and shoving. This conduct was unprovoked and constituted both battery and assault, as it involved unwanted physical contact and caused Plaintiff to fear imminent harm.

267.    Defendant Cheryl Puls also committed acts of assault and battery on April 17, 2021, by intentionally blocking Plaintiff's path as he attempted to leave his residence. Her exaggerated reaction, coupled with her refusal to allow Plaintiff to pass, was intended to provoke a confrontation, leading directly to the physical aggression by Defendant Daniel Puls.

268.    As a result of Defendants' intentional and unlawful actions, Plaintiff experienced unwanted physical contact, fear for his safety, and emotional distress.

269.    The conduct of Defendants was undertaken without Plaintiff's consent and with disregard for Plaintiff's right to be free from harmful or offensive contact and the fear of such contact.

270.    The acts of battery and assault committed by Defendants Cheryl Puls and Daniel Puls caused Plaintiff to suffer emotional distress, fear for his safety, and fear that Defendants would conspire to cause greater harm to Plaintiff in the future.

271.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT XV
## Intentional Infliction of Emotional Distress – Ms. Puls

272.    Plaintiff repeats and realleges paragraphs 1 through 271 as set forth above.

273.    Throughout the marriage, Defendant Ms. Puls made several hundred vile and insidious threats to terrorize, manipulate, and control Plaintiff, Mr. Quinlan.

274.    These threats frequently included threats to instigate malicious prosecution, threats to slander Plaintiff through false allegations of abuse, and threats to destroy his career and reputation.

275.    Ms. Puls made these threats both verbally and through text messages, often several times per week and, on some occasions, multiple times per day. These threats were never reasonably justifiable.

276.    Several threats were aimed at coercing Mr. Quinlan into doing a variety of acts against his will (including sexual intercourse). For example, on December 8, 2019 Ms. Puls demanded sexual intercourse from Mr. Quinlan. Mr. Quinlan stated that he would "*rather go to jail*" than have sex with Ms. Puls, and she responded "***Okay. I can arrange that***." On multiple occasions, Plaintiff felt compelled to comply with these threats to avoid the severe consequences Ms. Puls had promised.

277.    Ms. Puls regularly threatened to cause severe harm to Plaintiff, warning that if Plaintiff chose to divorce her, she would instigate malicious prosecution, tarnish his reputation through false allegations of abuse, ruin his career and job prospects, and sever his relationship with his children.

278.    **After the divorce was finalized, Ms. Puls demonstrated that these extreme threats were not idle but were part of a deliberate and malicious plan.** She acted on these threats as vindictive

45

punishment for the divorce, initiating a series of harmful actions, including false allegations, malicious prosecution, and interference with Plaintiff's parental rights.

279.    Ms. Puls' actions in actualizing these malicious threats constitute outrageous, extreme, and shocking conduct that amounts to intentional infliction of emotional distress upon Plaintiff. Her actions were calculated and carried out with the intent to cause Plaintiff severe emotional pain and suffering.

280.    As a direct result of Ms. Puls' intentional and outrageous conduct, Plaintiff has suffered severe emotional distress that has affected every aspect of his life, including his family relationships, personal relationships, ability to work, mental and physical health, reputation, and financial stability.

281.    The tortious actions of Ms. Puls against Plaintiff were so severe, ruthless, extreme, and malicious that they would shock the conscience of any reasonable person.

282.    As a direct and proximate result of Ms. Puls' intentional infliction of emotional distress, Plaintiff was deprived of his relationship with his children and suffered severe mental and emotional anguish, as well as other grievous and continuing injuries and damages.

283.    WHEREFORE, Plaintiff demands judgment against Defendant Ms. Puls in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## COUNT XVI
## Breach of Contract – Ms. Puls

284.    Plaintiff repeats and realleges paragraphs 1 through 283 as set forth above.

285.    Ms. Puls and Mr. Quinlan settled their divorce through mediation, agreeing to a contract that established joint custody of the children and parenting time for both Ms. Puls and Mr. Quinlan.

286.    The divorce settlement was established on December 8, 2022.

287.    Ms. Puls entered into the divorce settlement in bad faith, without any intentions of abiding by the agreement.  Primarily, Ms. Puls wanted full custody of the children and did not want Mr. Quinlan to be able to participate in their medical care.

288.    After entering into this contract, Ms. Puls immediately resumed her strategy of making false allegations of sexual abuse of the children against Mr. Quinlan.

289.    Just seven (7) weeks after the divorce settlement agreement was made, Ms. Puls succeeded in getting Mr. Quinlan arrested, prosecuted, and cut off from access to the children.

290.    In so doing, Ms. Puls breached all the contract terms regarding the custody part of the divorce settlement agreement.

291.    Further, in addition to breaking the custody agreement, Ms. Puls also broke the financial agreement by refusing to remove Mr. Quinlan from the auto loan agreement for their 2018 Honda Odyssey.

292.    Ms. Puls then missed loan payments on this auto loan, which caused great harm to Mr. Quinlan's credit score even though Mr. Quinlan was no longer responsible for the auto loan payment.

293.    Further, the malicious prosecution of Mr. Quinlan has also made it impossible for Mr. Quinlan to hold a job.  The legal fees and the inability to work have caused Mr. Quinlan to go deep into debt.

294.    In so doing, Ms. Puls also breached the terms of the financial portion of the divorce settlement agreement.

295.    As a direct and proximate result of Ms. Puls' breach of contract, Plaintiff suffered substantial harm, including legal fees, loss of access to his children, emotional distress, financial damage, and reputational damage.

296.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of jurisdictional limits, along with punitive damages and any other relief this Court deems just and appropriate.

## PRECLUSION OF COUNTERCLAIMS

297.    As part of the divorce settlement agreement, both parties had the opportunity to resolve and address any and all claims, disputes, or grievances arising from the marital relationship, including any alleged conduct or incidents occurring between March 16, 2016, and December 8, 2022.

298.    The divorce settlement agreement constitutes a full and final resolution of any claims or potential claims between Plaintiff and Ms. Puls arising out of events during the marriage. The agreement expressly or impliedly precludes any party from bringing future claims related to the period of the marriage.

299.    As a result, any counterclaims or allegations by Defendant Ms. Puls against Plaintiff that originate from conduct occurring during the marriage (March 16, 2016, to December 8, 2022) are precluded by the terms of the divorce settlement agreement and are therefore barred in this proceeding.

300.    Defendant Ms. Puls is being sued only for tortious actions carried out after the couple were divorced. There is no similar agreement between the Plaintiff and Defendants Cheryl Puls or Daniel Puls.

## REQUESTED RELIEF

WHEREFORE, Plaintiff Carsten J. Quinlan, respectfully requests that this Court enters judgment in his favor and against Defendants, awarding compensatory damages, punitive damages, attorney's fees and costs to the sum of **$2,500,000** along with any other relief this Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff Carsten J. Quinlan hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

## **SIGNATURE**

Plaintiff, Carsten J. Quinlan, hereby declares under penalty of perjury that the foregoing is true and correct to the best of his understanding and belief.

_____

Carsten J. Quinlan
Plaintiff, Pro Se

Date:        December 13, 2024
Address:   8643 Hudson Bay
                 Woodbury, MN 55125
Phone:     (925) 980 7210
Email:       cjquin8@gmail.com